LEAHY REALTY CORPORATION, Plaintiff-Appellant and Cross-Appellee, v. AMERICAN SNACK FOODS CORPORATION *et al.*, Defendants-Appellees and Cross-Appellants (Snack Foods Investment Corporation, a/k/a J & J Snack Foods Investment Corporation, *et al.*, Defendants-Appellees).

Second District   No. 2—93—0446

Opinion filed October 13, 1993.—Modified on denial of rehearing December 16, 1993.

Morrison & Morrison, P.C., of Waukegan (Donald T. Morrison, of counsel), for appellant.

Daniel P. Felix, of Wildman, Harrold, Allen & Dixon, of Waukegan (Paul S. Chervin, of counsel), Hunt & Scaramella, P.C., of Cherry Hill, New Jersey (H. Thomas Hunt III, of counsel), and Mark Osman, of McKellog, Kenney & Ross, of La Jolla, California, for appellees.

JUSTICE COLWELL delivered the opinion of the court:

Plaintiff, Leahy Realty Corporation (Leahy), filed a five-count complaint against various defendants, American Snack Foods Corporation (American Snack Foods), J & J Snack Foods Corporation (J & J Snack Foods), Snack Foods Investment Corporation (Snack Foods Investment), Snack Foods Acquisition Corporation (Snack Foods Acquisition), and Eric Brown (Brown), based on breach of an industrial lease. Defendants counterclaimed, alleging that Leahy committed fraud and failed to make promised repairs. Plaintiff appeals, alleging that the trial court erred in directing a verdict on the breach of lease counts and in numerous evidentiary decisions during the trial. American Snack Foods also appeals on its counterclaims, alleging the trial court erred in instructing the jury. We reverse and remand this cause for a new trial.

This case concerns an industrial lease on a warehouse building at 3434 Runge Street in Franklin Park, Illinois. Leahy constructed the building in 1972 and leased the premises as a food distribution warehouse to Proficient Foods (Proficient) from 1974 to 1984. Proficient constructed a refrigeration unit on the roof of the building during their tenancy in order to store frozen foods.

Proficient vacated the premises in 1984, at which time Leahy demanded money for damages to the roof and refrigeration system allegedly caused by Proficient. Leahy and Proficient negotiated a settlement which directed that Proficient pay $133,000 to Leahy to cover damage to the roof, ventilating and air-conditioning and cooling systems, and other general repairs.

Leahy received a cost estimate from Kimbrel Roofing which presented four alternatives for repair of the roof: (1) fix leaks over cooler—$4,000, (2) general repairs and maintenance—$30,000, (3) reroof existing roof—$95,000, (4) tear off present roof and reroof—$145,000.

Around this time Eric Brown began negotiating with Leahy for the new tenancy on the building. Brown planned to produce soft pretzels through his company, American Snack Foods, under the name Philadelphia Pretzel Company. Leahy told Brown about the roof leaks during their negotiations. Leahy also told Brown that the refrigeration unit was in need of repair when Proficient vacated the building. Leahy received an estimate of $39,785 for its repair from RMC, Inc., Refrigeration (RMC). Leahy chose the $4,000 option to fix the roof leaks over the cooler. Leahy indicated it would take care of these re-

pairs and Leahy and Brown incorporated the following into a handwritten section added to the Rider on the lease:

"20.22 Lessor agrees to make the following repairs as soon as possible:

1. Repair all leaks in roof

2. Repair freezer-cooler units as per RMC proposal letter of 4/30/84

3. Remove fuel tanks from parking lot, if required by Village of Franklin Park to grant lessee permanent certificate of occupancy."

This section was initialed by both Brown and Leahy. They signed the lease on April 30, 1984, and Brown tendered $35,900 as a security deposit. The lease contained a provision relating to the security deposit which provided in pertinent part:

"20.17 In the event Tenant, following written notice from Landlord to Tenant as set forth in Sections 18.0 or 20.20 hereof, is in default of any of its obligations hereunder, including payment and performance obligations, *there shall be forfeited to Landlord, as liquidated damages, the entire remaining portion of the Security Deposit* then held on deposit pursuant to Sections 19.0 and 20.17 together with all undistributed interest earned thereon. The foregoing right of Landlord to liquidated damages shall be in addition to and not in lieu of all other rights and remedies afforded Landlord under the terms of this Lease." (Emphasis added.)

The lease also provided for the tenant's obligation to maintain the premises:

"9.0 Maintenance. Tenant shall keep and maintain the entire exterior and interior of the Leased Premises, specifically including without limitation, heating, ventilating and air conditioning equipment, the parking area and the roof, in good condition and repair, in full compliance with all health and police regulations in force and in conformity with the rules and regulations of fire underwriters or underwriters' fire prevention engineers. As used herein, each and every obligation of Tenant to keep, maintain and repair shall include, without limitation, all ordinary and extraordinary nonstructural repairs and replacements. Tenant shall, to the extent possible, keep the Leased Premises from falling temporarily out of repair or deteriorating."

With respect to the refrigeration system in particular, the lease provided:

"20.20(B) Restoration. In the event any alterations, modifications or additions are made to the aforesaid freezer, cooler or appurtenances by or on behalf of Tenant, Tenant shall, prior to to [*sic*] the termination of this Lease, at its sole cost and expense, restore said freezer, cooler and appurtenances to its condition at the Commencement Date of this Lease, ordinary wear and tear excepted, but in any event, to a good operating condition. Tenant's failure to so restore shall be deemed a default so as to avail Landlord of all of its rights pursuant to Sections 18.0 and 20.17 hereof."

Brown modified the refrigeration system after the commencement of his tenancy by cutting holes in the sides in order to run a conveyor belt which carried the baked pretzels through the cooler. Brown began to have problems with leaks in the roof about a year after his lease began. Brown made oral complaints to Leahy, but Leahy maintained that the roof was Brown's responsibility. Brown never complained to Leahy in writing. Brown hired someone to patch the leaks with tar but this failed to cure the problem.

Brown also suffered continuous problems with the refrigeration system. Brown paid $79,407 in maintenance charges on the freezer and cooler while occupying the premises. He planned to replace the refrigeration system in 1988 with a new "spiral" freezer.

Brown was contacted early in 1988 by Gerald Shreiber, president of J & J Snack Foods, who indicated his interest in purchasing American Snack Foods. Brown sold his business to Shreiber on May 23, 1988. Snack Foods Acquisition, incorporated on May 4, 1988, as a subsidiary of J & J Snack Foods, acquired the stock from Brown for approximately $3 million.

Donald Taylor, J & J Snack Foods' vice-president of operations, oversaw the closing of American Snack Foods' facility. J & J Snack Foods planned to close down American Snack Foods' plant, leave the building early, and negotiate a settlement with respect to the balance on the lease. Taylor received a memorandum from Shreiber on May 31, 1988, which instructed Taylor to negotiate out of the lease "a la Steven's style," referring to a previous transaction in which J & J Snack Foods had purchased a company and bargained out of the remaining lease.

Taylor spoke with Pat O'Brien, Leahy's leasing agent, about the lease and hand delivered the keys to the building on June 30, 1988. Taylor wrote O'Brien and requested that Leahy return the security deposit. O'Brien replied that American Snack Foods was liable for the remainder of the lease term, which continued through April 30, 1989.

O'Brien informed Taylor of some of the damage allegedly caused to the building by Brown during his tenancy, including missing refrigerator equipment and damages to the roof. O'Brien indicated he would send Taylor a report on the condition of the building. Taylor never received such report. Taylor indicated he would get back to O'Brien regarding negotiations on the lease but never did so.

Leahy filed suit against defendants on August 31, 1988. Leahy's count I alleged American Snack Foods and Brown were liable for breach of a commercial lease. Count II alleged J & J Snack Foods, Snack Foods Investment, and Snack Foods Acquisition also breached the lease as "alter-egos" of American Snack Foods. Count III claimed that J & J Snack Foods, Snack Foods Investment, and Snack Foods Acquisition were liable for trespassing onto leased property. Count IV alleged that J & J Snack Foods, Snack Foods Investment, and Snack Foods Acquisition intentionally induced American Snack Foods and Brown to breach the commercial lease. Count V claimed J & J Snack Foods, Snack Foods Investment, Snack Foods Acquisition, American Snack Foods, and Brown conspired together to breach the lease. Leahy claimed approximately $592,000 in compensatory damages and $500,000 in punitive damages. The compensatory damages included $56,828 in overdue rent and taxes, $300,000 depreciation on the building from American Snack Foods' neglect, and $182,000 in attorney fees. Leahy made an agreement to sell the building "as is" to James Valdevoulous in September 1988 and eventually closed in November 1988 for $1,200,000.

American Snack Foods counterclaimed, alleging Leahy (1) failed to provide a refrigeration system in proper mechanical condition and failed to upgrade the system, (2) failed to return American's security deposit and unused portion of tax deposit, and (3) fraudulently misrepresented the condition of the roof and refrigeration system and intent to repair them. Brown also counterclaimed, alleging Leahy (1) failed to provide a proper refrigeration system and failed to repair the roof, (2) breached its duty to deal fairly and act in good faith towards Brown, and (3) fraudulently misrepresented the condition of the roof and refrigeration system and Leahy's intent to repair same.

The trial testimony commenced on January 28, 1992. The first witness, Eric Brown, testified that he leased the building for the production of soft pretzels, which required cooling and freezing after the baking process. Brown was aware of the defects in the freezer at 3434 Runge Street since Leahy had agreed to perform repairs as per the RMC refrigeration proposal. Brown was also aware that the roof needed repairs but never investigated the cost of such repairs. He as-

sumed the $4,000 worth of repairs which Leahy completed was sufficient to take care of the problem. He recalled that Leahy promised to put the roof in "first class condition."

Brown suffered continuous problems with leaks in the roof during his tenancy. His attempts to patch the roof with tar did not alleviate the leakage problem. Brown testified that his employees had to knock ice off the conveyor belt every morning which was caused by water leaking from the roof and dripping into the freezer unit. Occasionally, his employees would have to knock off six- to eight-foot-long stalactites that formed on the ceiling of the freezer unit. This continuously hindered Brown's production process.

Brown also had numerous problems with the refrigeration system even after RMC completed the $39,785 repairs. Brown had signed an agreement with RMC to inspect the refrigeration equipment but did not sign the maintenance agreement as requested by section 20.20 of the lease. Brown paid out approximately $80,000 in repairs for the refrigeration system during his tenancy. Leahy did pay half of the costs of a new compressor which was required about two years into Brown's tenancy. Brown decided sometime in 1987 that a spiral freezer was a better alternative for the "blast freezing" of his pretzels since the system in the building repeatedly broke down. He entered into a contract for new refrigeration equipment but postponed this purchase in April 1988 after he decided to sell his company to J & J Snack Foods.

Brown and Shreiber closed the deal for the purchase of Brown's company, American Snack Foods, in May 1988. J & J Snack Foods assumed some of Brown's loans, including the lease which Shreiber initialed on every page at the closing. Brown said he remained at the premises for about five weeks after the sale to facilitate the closing of his plant, assimilate the production distribution, and clean the building. Brown described in detail how he and other employees cleaned the premises. The plant equipment was dismantled and taken to other plants and the electrical wiring was disconnected.

Brown never informed Leahy he was selling his company to J & J Snack Foods, as required under section 10.2 of the lease. Brown admitted he was aware of the provision in the lease requiring him to notify Leahy of the sale of his company and the assignment of the lease to J & J Snack Foods. He informed Leahy after the sale that all obligations were now assumed by J & J Snack Foods.

Dennis Moore, corporate controller at J & J Snack Foods, testified over plaintiff's objection that almost all of American Snack Foods' liabilities had been settled and paid by J & J Snack Foods. Total liabili-

ties, excluding the Leahy lease, amounted to approximately $800,000, of which $750,000 was paid by J & J Snack Foods. Moore stated that Leahy was not paid because they were unable to reach a settlement with Leahy on the lease.

Pat O'Brien testified that he has been a licensed real estate broker in Illinois since 1970 and currently specialized in industrial real estate. O'Brien was familiar with the entire history of 3434 Runge Street as Leahy's real estate agent. O'Brien gave a detailed description of the building and the leases on the property since 1972. He saw the premises after Brown had vacated and testified that the damages included a broken gate and fuel tank in the parking lot, abandoned barrels and a vehicle around the outside lot, broken panels on the overhead doors, wiring removed from the main panel to the production equipment, wiring removed and exposed on the main electrical panel, holes in the wall of the cooler, missing freezer equipment, dirty carpeting in the office, and missing ceiling panels in the office.

O'Brien said he was commissioned to sell the property for $1,650,000 or such lesser price as he saw fit. The building eventually sold for $1,200,000. Defendant's counsel objected when the witness was asked if he had an opinion of the fair-cash market value of the property as of July 1, 1988, if it were in the same general condition of maintenance as it was when the lease was entered into in April 1984. The trial court sustained the objection, noting that the witness was not a Member of the Appraisal Institute (M.A.I.).

Ned Kimbrel, a roofing contractor, testified that he inspected the roof on the building at issue in April 1984. He presented Leahy with four options on repairing the roof, ranging from $4,000 to $145,000. Kimbrel testified his $30,000 estimate for general repairs was necessary to prevent future leakage and "to keep the roof in serviceable condition." Kimbrel said he noticed numerous cracks and splits that were not leaking at the time he made his estimate but would eventually leak.

Eugene Stunard, a real estate appraiser, testified that he prepared an appraisal report on the subject property in August 1988. His opinion as to the fair-cash market value of the building was $1,200,000 subject to removal of the underground tanks. Stunard also testified over objection that his opinion of the fair-cash market value of the building was $1,350,000 subject to repair of the roof, repair or replacement of the doors and upgrading the office. Stunard admitted he had no knowledge of the value of the building in 1984.

James Leahy testified that during the lease negotiations he agreed to fix the leaks in the roof but that Brown was responsible for

maintaining the roof after these repairs. Leahy also agreed to pay for repair of the refrigeration unit as per the RMC estimate.

Leahy knew nothing about J & J Snack Foods' purchase of Brown's business until Leahy called Brown to inquire why it had not received the June rent. The last rent payment Leahy received was for May 1988. Brown informed Leahy that J & J Snack Foods was now responsible for all obligations under the lease. Leahy called Taylor, who promised to call Leahy back and discuss the issue. Leahy never spoke to Taylor again.

Leahy inspected the premises with O'Brien after Brown had vacated them. Leahy's testimony reiterated much of O'Brien's description of the damage to the building. Leahy, who had previously placed Brown's security deposit into his Kemper account, ordered Kemper to credit the security deposit to Leahy's general account shortly after the premises were vacated. Leahy maintained that this transfer did not mean it was taking the security deposit as liquidated damages for rent or any other obligation due under the lease. Plaintiffs then rested.

Defendants moved for a directed verdict on the liquidated damages and that motion was granted. The trial court found, over strenuous objection by Leahy's counsel, that by taking the security deposit Leahy was limited to that amount as liquidated damages under the provisions in section 20.17 of the lease.

Defendants presented testimony from Fred Eder, a refrigeration repairman, who testified he was employed by RMC and had given Leahy an estimate dated May 4, 1984, on repairs to the refrigeration units. Eder serviced the refrigeration unit during Brown's tenancy and said in his 20 years of experience he had never seen a system that required the volume of service calls as that in Leahy's building.

Latimer Takoy, a former RMC employee and currently a technical service representative in refrigeration, testified he was involved with the initial repairs of the refrigeration system in Leahy's building during 1984. Takoy stated that the system was an "ongoing nightmare" and in fact was the worst system he had ever come across in his 15 years of servicing refrigeration units.

Peter Heraty, president of the company that installed the freezer unit for Proficient Foods in 1974, testified that he thought the rooftop equipment should have been replaced in 1984 and that would have alleviated the problems with the freezer. Heraty testified that the system was originally designed as a holding freezer and that it would not work satisfactorily in a blast freezing condition. Heraty opined that if

one were to cut a hole in the wall of the freezer and let air come in, this would cause ice to build up.

William Connett testified that he was called in 1984 to provide estimates for roof repair on the subject building. He concluded at that time that the roof was beyond repair and should be replaced. He presented an estimate of $40,000 to repair the roof and make numerous other repairs to the building and the surrounding premises.

Brown testified as to the condition of the premises when he vacated them and basically stated that many of the items of disrepair were in the same condition as when he entered the lease in 1984. He stated that Leahy never told him about the Kimbrel options to replace or repair the roof. Brown said he knew the lease provided that the tenant should keep the roof in good condition and repair, but he did not know that the lease required him to maintain the roof without limitation in all structural and nonstructural repairs. Brown believed from his conversations with other people that the refrigeration system in the building should have been able to handle the blast-type freezing which was necessary in the production of his pretzels.

The jury returned a verdict for defendants on count IV, tortious interference. Count III had earlier been withdrawn and the parties agreed to dismiss count V. The jury also found for Leahy on counts I and III of the counterclaim. Count II of the counterclaim was withdrawn. Both parties submitted post-trial motions which were denied and both made a timely appeal.

We first address Leahy's argument that the trial court erred in directing a verdict on the breach of lease issue, counts I and II, effectively ruling that Leahy was not entitled to recover actual damages in addition to the security deposit as liquidated damages. A verdict should only be directed in those cases "in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) The trial court found that Leahy had forfeited all its rights to any other damages when it took Brown's $35,900 security deposit as provided in section 20.17 of the lease. Leahy's first argument, that it merely comingled the security deposit with other funds as allowed in section 19.0(c) of the lease, is without merit since Leahy did not return the deposit at any time after American Snack Foods vacated the premises. The evidence indicates that Leahy retained the security deposit.

Defendants maintain that, by retaining the security deposit, Leahy is precluded from recovering actual damages. Section 20.17

provides in pertinent part that in the event of tenant's default, "there shall be forfeited to landlord, as liquidated damages, the entire remaining portion of the security deposit then held on deposit pursuant to sections 19.0 and 20.17 together with all undistributed interest earned thereon." However, Leahy contends that other language in the lease overrides the liquidated damages provision. First, section 20.17 continues: "The foregoing right of landlord to liquidated damages shall be in addition to and not in lieu of all other rights and remedies afforded landlord under the terms of this lease." The lease also states under section 18.1:

"18.1 Remedies Cumulative. No remedy herein or otherwise conferred upon or reserved to Landlord shall be considered to exclude or suspend any other remedy *but the same shall be cumulative and shall be in addition to every other remedy given hereunder*, or now or hereafter existing at law or in equity or by statute, and every power and remedy given by this lease to landlord may be exercised from time to time and so often as occasion may arise or as may be deemed expedient.

19.0 Security Deposit. To secure the faithful performance by Tenant *** Tenant has deposited herewith the sum of $35,900.00 with landlord as a security deposit on the understanding: (a) that such deposit or any part or portion thereof not previously applied, or from time to time, such one or more parts or portions thereof may be applied to the curing of the non-monetary default that may then exist *without prejudice to any other remedy or remedies which the landlord may have on account thereof ***.*" (Emphasis added.)

■ Illinois courts will ordinarily find a liquidated damages provision to be valid and enforceable in a real estate contract when: (1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove. (*Curtin v. Ogborn* (1979), 75 Ill. App. 3d 549, 554-55.) Leahy does not contend that the liquidated damages provision here is not valid, but rather that the provision is controverted by other language in the lease. The lease here also provides for damages in section 18 as follows:

"Upon termination of the Lease, Landlord shall be entitled to recover as damages, all rent and other sums due and payable by Tenant on the date of termination, plus (1) an amount equal to the value of the rent and other sums provided herein to be

paid by Tenant for the residue of the stated term hereof, less the fair rental value of the Leased Premises for the residue of the stated term (taking into account the time and expenses necessary to obtain a replacement tenant or tenants, including expenses hereinafter described relating to recovery of the premises, preparation for reletting and for reletting itself), and (2) the cost of performing any other covenants to be performed by Tenant."

The trial court based its decision to direct a verdict for defendants on *Morris v. Flores* (1988), 174 Ill. App. 3d 504. In *Morris*, plaintiffs filed suit for breach of a real estate contract. The contract contained a liquidated damages clause which provided:

"Such monies shall be deemed to represent damages sustained, provided, however, that this provision with the respect to liquidated damages shall not be the exclusive remedy of Seller, and Seller shall retain all monies deposited without prejudice to his other remedies." *Morris*, 174 Ill. App. 3d at 505.

This court upheld the liquidated damages provision in *Morris* after making a specific finding that the other remedies plaintiff had under the agreement were nonmonetary, stating:

"While the contract does provide that the seller may retain the liquidated damages without prejudice to his 'other' remedies, the 'other' remedies refers to rights of a kind and character other than money damages. [Citation.] It would be inconsistent to provide in the contract for liquidated damages and also allow a party to pursue other remedies for money damages. The contract here did not provide that the seller, at his option, could elect not to accept liquidated damages and pursue all other legal remedies. ***

*** As discussed above, the liquidated damages clause in this case did not prevent plaintiffs from seeking remedies other than money damages, such as injunctive relief." *Morris*, 174 Ill. App. 3d at 507.

■ We hold that *Morris* is not dispositive of the case at hand. Defendants here correctly note that the liquidated damages clause in the instant case also contains the directive *"shall"* be forfeited to landlord as liquidated damages, similar to the wording of the liquidated damages clause in *Morris*. However, the lease here contains a further directive which states: "The foregoing right of landlord to liquidated damages *shall* be *in addition to and not in lieu of all other rights and remedies afforded landlord* under the terms of this lease." (Emphasis added.) Section 18 of the lease here states that, upon ter-

mination of the lease, the landlord is entitled to recover as damages, among other things, "all rent and other sums due and payable by Tenant on the date of termination." The lease further provides in section 18.1 that all remedies provided therein are cumulative, and section 19 provides that the security deposit may be applied to a nonmonetary default without prejudice to any other remedy. These provisions indicate that the liquidated damages clause was not meant to be the landlord's sole remedy. Further, the facts in the instant case differ considerably. *Morris* concerned a real estate contract containing express terms which limited the monetary compensation for the seller's damages to the $100 tendered as earnest money.

We believe that *Illinois State Toll Highway Authority v. Gust K. Newberg, Inc.* (1988), 177 Ill. App. 3d 6, is more applicable to the case at hand. In *Newberg*, the Illinois State Toll Highway Authority (Authority) sought liquidated damages for Newberg's alleged delay in performing a construction contract. The contract provided for liquidated damages for each day of delay. It further provided that the Authority "shall" recover any liquidated damages by deducting the damages from amounts due to the contractor and that:

> "[n]othing herein contained shall be construed as limiting the right of the Authority to recover from the Contractor any and all amounts due or to become due, and any and all costs and expenses sustained by the Authority for improper performance hereunder, repudiation of the Contract by the Contractor, failure to perform, or breach or breaches in any other respect including, but not limited to, defective workmanship or materials." (*Newberg*, 177 Ill. App. 3d at 10.)

This court found that the above provision did not limit the Authority's right to collect liquidated damages from amounts retained from the progress payments. We noted that parties to a contract may limit their rights, duties, and obligations by express agreement, but the contract must clearly show that the stipulated remedy is the sole or exclusive remedy. The relevant provision in *Newberg* provided that nothing contained in the agreement limited the Authority's right to recover any amount due because of a contract breach *in any respect.* Therefore, the language providing for liquidated damages was not intended to restrict or limit the Authority's collection of liquidated damages solely to the retainage. *Newberg*, 177 Ill. App. 3d at 14.

The fact that the liquidated damages provision in *Newberg* only applied to damages caused by delay, as opposed to the provision here which is not so limited, does not preclude us from applying the same basic principles to the instant case. Proper contract interpretation re-

quires that a court read the contract as an entirety. A contract should not be interpreted by reference to particular words or isolated phrases, but rather by considering each part in light of the others. (*Newberg*, 177 Ill. App. 3d at 14.) Courts should avoid giving an interpretation to a provision that will nullify the clear and unambiguous language of another provision. Here, the language in sections 18, 18.1, 19, and 20.17 provided for damages to the landlord beyond the liquidated damages provision; thus, Leahy's retention of the security deposit did not preclude him from recovering further alleged damages. Accordingly, we hold the trial court erred in directing a verdict for defendants, and we reverse and remand for a new trial as to the amount of damages.

Leahy next contends that the trial court erred in refusing to allow Frederick Hogan, the attorney who drafted the American Snack Foods lease for Leahy, to testify about the circumstances surrounding the drafting of the lease, the various provisions of the lease regarding damages, or the provisions regarding cumulative remedies. The trial court sustained defense counsel's objection to Hogan's interpretation of the provisions in the lease or his explanation why he added certain provisions in the lease. The court stated that a witness did not have the right to make an interpretation of the lease and that it was an issue to be determined by the jury. The trial court specifically found the provisions in the lease to be unambiguous.

■ The meaning of a written contract is generally a question of law and not one of fact. (*Lenzi v. Morkin* (1984), 103 Ill. 2d 290, 293.) The intent of the parties to an unambiguous contract, as in the instant case, must be determined solely from the words of the contract. (*Prairie Land Construction, Inc. v. Village of Modesto* (1991), 213 Ill. App. 3d 364, 370.) A court should look to the language of an unambiguous contract itself in ascertaining the intention of the parties and not to the construction placed upon it by the parties. (*Morkin*, 103 Ill. 2d at 293.) Accordingly, we find that the trial court properly refused Hogan's testimony, since his interpretation of the lease should not be the basis for determining the intent of the damages provisions.

Leahy next contends that the trial court improperly admitted evidence of Leahy's settlement with Proficient Foods on the damages to the premises. Myron Siegal, attorney for Proficient Foods at the time of the settlement, was allowed to testify that the $133,000 settlement fee which Proficient Foods paid to Leahy included $57,000 for the roof and $39,000 for the cooling system. Leahy claims this evidence was prejudicial since it deliberately created the impression that Leahy was required to put this money back into the building.

A trial court's ruling on review of evidentiary issues is subject to the abuse of discretion standard (*Oak Brook Park District v. Oak Brook Development Co.* (1988), 170 Ill. App. 3d 221, 234). In case of trial court error, a reversal is called for only if the evidence improperly admitted was sufficiently prejudicial to change the outcome of the trial. *Cairns v. Hansen* (1988), 170 Ill. App. 3d 505, 511.

■ We find evidence of the condition of the premises was relevant in order to show the disrepair which occurred prior to the time when Brown took over the lease. Leahy's argument that it is improper to prove specific dealings with one person by proving specific dealings with another does not pertain to the present circumstances. As noted previously in *349 West Ontario Building Corp. v. Palmer Truck Leasing Co.* (1974), 22 Ill. App. 3d 467, 476:

> "To recover under the terms of the sublease the plaintiffs were required to show that the condition in which the premises were returned to plaintiff Bruce was different from the condition when the subtenants took possession and that the difference amounted to compensable injury to the plaintiffs or either of them."

Similarly, in *First National Bank v. Shape Magnetronics, Inc.* (1985), 135 Ill. App. 3d 288, the court directed a verdict for the lessee in an action for breach of covenant to repair an industrial building since the lessor failed to introduce evidence of the condition of the building at the commencement of the lease and thus failed to establish a *prima facie* case. (*First National Bank*, 135 Ill. App. 3d at 292-93.) Here, the settlement with Proficient Foods allocated $57,000 for repairing and replacing the roof. However, Leahy only spent $4,000 to patch the leaks above the cooler. Such evidence was relevant in defense of Leahy's claim that Brown caused the damage to the premises and refuted Leahy's claims that it fully repaired the roof. We find the trial court did not err in admitting such evidence.

■ Similarly, we reject Leahy's contention that the trial court erred in admitting evidence of prior maintenance problems in the building when the maintenance responsibility under the lease was on Brown. The trial court denied Leahy's motions *in limine* to bar any evidence of repair or maintenance problems with the refrigeration unit or the roof during the term of Brown's lease and allowed the freezer and roofing repairmen to testify as to the conditions of both at trial. Leahy argues that evidence of maintenance during Brown's tenancy is irrelevant since it was Brown's duty to make such repairs. This evidence was properly admitted in order to show whether Leahy fulfilled its agreement in section 20.22 of the lease to repair the roof

and the freezer units. Brown presented evidence of the maintenance on the roof and freezer in an attempt to show that the repairs necessary during his tenancy were due to the inadequate repairs executed by Leahy as opposed to any fault of Brown's.

Leahy next contends that J & J Snack Foods, as a corporate successor to American Snack Foods, was not privileged to breach the lease so as to escape tortious interference liability. Leahy's count IV alleging tortious interference was its only claim to go to the jury. Leahy alleged that J & J Snack Foods tortiously interfered with the lease between American Snack Foods and Leahy by planning to abandon the leasehold while American Snack Foods was still a party to the lease. Leahy claims the court committed error when it included the following language in jury instruction No. 8:

> "Fifth, that defendant was not privileged to induce the breach of contract."

This instruction listed the elements which must be proved for a successful tortious interference with contract claim. Leahy objected to the fifth element of the instruction, stating that since there was no evidence of any privilege in this case, Leahy need not prove that J & J Snack Foods lacked justification for the interference with the contract.

■ The elements of tortious interference with contract are: (1) the existence of a valid, enforceable contract between plaintiff and another; (2) defendant's awareness of this contractual relationship; (3) defendant's intentional and unjustified inducement of a contractual breach; (4) a subsequent breach by the other as a result of defendant's wrongful acts; and (5) damages. (*H P I Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.* (1989), 131 Ill. 2d 145, 154-55.) A third party often may be privileged to purposely bring about a breach of a plaintiff's contract with another when the third party is acting to protect a conflicting interest that is considered under the law to be of a value equal to or greater than the plaintiff's contractual rights. (*Certified Mechanical Contractors, Inc. v. Wight & Co.* (1987), 162 Ill. App. 3d 391, 400.) However, the third party's acts to bring about the breach must be legal acts and must not be unreasonable in the circumstances. (*Certified Mechanical Contractors*, 162 Ill. App. 3d at 400.) An instruction asking the jury to ascertain whether J & J Snack Foods was privileged to induce the breach of contract is relevant to the determination of whether defendant intentionally and unjustifiably induced the contractual breach. We find the portion of the jury instruction was not error.

Leahy next argues that the trial court erred in striking its jury demand as to attorney fees and excluding evidence thereof when attorney fees were provided for in the lease and a jury was reasonably demanded. The amount of attorney fees at issue in this case was $180,000 to $200,000. The trial court ruled on a motion *in limine* that the issue of attorney fees was not to be taken from the jury. However, on defendant's motion during trial the court struck the jury demand as to attorney fees.

Generally, each party to litigation is responsible for his own attorney fees under the American rule. In the absence of a legislative enactment, the American rule provides that the successful litigant is not entitled to recover fees and the ordinary expenses of trial preparation and litigation. (*State Farm Fire & Casualty Co. v. Miller Electric Co.* (1992), 231 Ill. App. 3d 355, 359.) A court may shift the fees if a statute authorizes the court to order the losing party to pay the prevailing party's fees. (*State Farm Fire & Casualty Co.*, 231 Ill. App. 3d at 359.) Moreover, a court may properly award attorney fees according to the specific language of a contract. (*Exchange National Bank v. Sampson* (1989), 186 Ill. App. 3d 969, 974.) The lease here provides for attorney fees to the landlord in section 13 under the title "Indemnity and Waiver."

Plaintiff cites *Madison Associates v. Bass* (1987), 158 Ill. App. 3d 526, in support of its position that the trial court here improperly took the issue of attorney fees from the jury. The *Bass* decision does indicate that the jury returned a verdict for the plaintiff on the issue of attorney fees under a lease; however, neither party in that case objected to the jury hearing the issue.

Defendants contend that the trial court's ruling should be upheld since plaintiff has cited no law stating that attorney fees are a jury issue. Defendants argue that *Boatmen's Bank v. Dowell* (1991), 208 Ill. App. 3d 994, is dispositive of this issue. In *Dowell*, the defendant stated she had a constitutional right to have a jury decide the attorney fees issue. All other issues in that case had previously been determined in a bench trial. The reviewing court rejected defendant's argument and noted that it found no cases which held that it is a jury's duty, not a trial court's duty, to determine the amount of reasonable attorney fees. The court also noted that certain statutes, such as the Illinois Insurance Code and the Illinois Parentage Act of 1984, provide for the award of attorney fees by the trial court rather than a jury in some cases. *Dowell*, 208 Ill. App. 3d at 1004.

■ Nonetheless, we do not believe *Dowell* precludes the jury from rendering a decision on attorney fees here since a question of

fact exists and plaintiff filed a timely and proper jury demand. The attorney fees issue is no different than the other damages issues which are to be determined on remand of this case. Accordingly, we conclude that the resolution of this question is properly for the jury.

Plaintiff next contends the trial court erroneously excluded O'Brien's opinion on the value of the subject building because he was not an M.A.I. During trial testimony the following occurred:

"MR. MORRISON (Leahy's counsel): Q. Did you form an opinion of the fair cash market value of the Runge property as of July 1st, 1988, if it were in the same general condition of maintenance as it was when the lease was entered into in April of 1984?

MR. CHERVIN (Defendant's counsel): Objection.

THE COURT: Sustained. Sidebar.

(Whereupon a sidebar was had outside the hearing of the jury as follows:)

MR. CHERVIN: This witness is not an expert. His own words. I'm not an appraiser.

THE COURT: He's not an expert. He wasn't tendered as 220.

MR. MORRIS: Judge—

MR. CHERVIN: Oh, no.

THE COURT: Was he tendered as 220?

MR. CHERVIN: No, Judge. This man is not an expert witness. He testified that he is not an appraiser.

THE COURT: That's right. He said all that.

MR. CHERVIN: His own words.

THE COURT: He said he's not an MAI.

MR. MORRISON: He doesn't have to be. What he has to be is a real estate broker.

MR. CHERVIN: He's not a 220 expert either.

\* \* \*

MR. MORRISON: Well, the matter of him not being a 220 expert—

THE COURT: Well, that's more important, more important than the 220.

MR. STANDA: We had many discussions with Mr. Felix back in August and I sent Mr. Felix—We sent a letter. In this letter—I can go back out of court.

THE COURT: He said he's not an MAI. He said—

MR. STANDA: We declared him as an expert. We stated—

\* \* \*

THE COURT: You don't go by fair cash market value. You show me one case in for determination of damages that we have fair cash market value.

MR. CHERVIN: We just gave you three cases.

THE COURT: None of it shows it. Sustained. Sustained."

■ Leahy contends that O'Brien, who has been a real estate broker since 1970 and has specialized in industrial real estate, is qualified to testify as to valuation due to his practical experience. We agree with Leahy that O'Brien should not have been precluded from testifying as to the value of the building on the basis that he was not an M.A.I. An expert's opinion may be based upon practical experience as well as academic or scientific training. *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.* (1990), 196 Ill. App. 3d 5, 17.

In *349 West Ontario Building Corp. v. Palmer Truck Leasing Co.* (22 Ill. App. 3d 467), the plaintiff wished to prove its theory of damages that the sale price of the premises was less than it should have been as a result of the subtenant's breach. Plaintiff presented the testimony of a real estate broker who was familiar with real estate values in the area. The broker's testimony was refused since he would only have been able to testify to the general condition of the building and not the diminution of value which resulted from the subtenant's breach. *Palmer*, 22 Ill. App. 3d at 478.

Here, O'Brien was familiar with Leahy's building and the premises both before Brown's tenancy and after; therefore, he would have actual knowledge of the condition of the premises on both dates. O'Brien's testimony indicated that he has considerable knowledge of the marketplace. This experience, in addition to his familiarity with the history of the building, would qualify him to testify as to the fair-cash market value of the property if it were in the same general condition as it was when the lease was entered into in April 1984. We hold that the trial court erred in refusing O'Brien's opinion testimony.

Leahy's last contention is that the trial court erred in refusing to give Leahy's special interrogatory on a material issue. Leahy's special interrogatory asked: "Did the defendants breach the lease with plaintiff?" Section 2—1108 states in relevant part:

"Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact

submitted to the jury in writing." (735 ILCS 5/2—1108 (West 1992).)

The phrase "material question or questions of fact" has been interpreted to mean an ultimate fact or facts upon which the rights of the parties depend. (*Vulcan Materials Co. v. Holzhauer* (1992), 234 Ill. App. 3d 444, 452.) A trial court's refusal to submit a proper interrogatory usually constitutes reversible error. *Vulcan Materials Co.*, 234 Ill. App. 3d at 452.

■ In this case the special interrogatory was properly refused. Such question referred to Leahy's claim of tortious interference. The proposed interrogatory would not have been controlling on this claim since the question was not referenced by any date, specifically, before May 23, 1988, which was the date of the stock purchase agreement between Brown and Snack Foods Acquisition. Tortious interference could not have occurred after this date since J & J Snack Foods acquired American Snack Foods and thus could not tortiously interfere with its own contract. *Regan v. Garfield Ridge Trust & Savings Bank* (1991), 220 Ill. App. 3d 1078, 1088.

We now turn to defendants' contentions on appeal of their counterclaims. Defendants first argue that the trial court should have instructed the jury on defendants' claim of fraudulent concealment. Defendants' instruction 20(a) read in pertinent part:

"A claim in fraud may also be based upon the intentional concealment of a material fact.

To prove fraud based upon the concealment of a material fact, American Snack Foods must prove:

(1) that the plaintiff knowingly concealed a material fact under circumstances creating an opportunity or duty to speak;

(2) that the fact was concealed with the intent to deceive;

(3) that American Snack Foods relied upon the failure to disclose said fact; that is, had American Snack foods known the true state of affairs, it would have changed its position;

(4) that American Snack Foods was damaged as a result.

Fraud may consist of a positive assertion of falsehood or a creation of a false impression by words or acts, or of the concealment or suppression of truth.

A misrepresentation is 'material' if it relates to a matter upon which American Snack Foods would be expected to rely in determining to enter into the lease in question."

Defendant tendered instruction No. 20 believing that it instructed the jury regarding fraud by way of concealment, in addi-

tion to fraud by way of affirmative misrepresentation. The trial court declined the instruction due to the insufficiency of the evidence of fraudulent concealment brought out during the trial. In addition, the court felt this instruction was duplicitous because a fraud instruction was given under the issues instruction. Defendant argues, however, that the previous fraud instruction did not include the elements for a claim for fraudulent concealment.

■■ The test for jury instructions is whether they provide a clear and adequate picture of the relevant law when viewed in their entirety. (*National Surety Corp. v. Fast Motor Service, Inc.* (1991), 213 Ill. App. 3d 500, 509.) A trial court may properly refuse instructions which are repetitious, confusing, or overly wordy. (*National Surety Corp.*, 213 Ill. App. 3d at 509.) The instruction given at trial covered the elements of a cause of action for fraudulent misrepresentation as disclosed in *Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286. Since the issues instructions had already covered fraud, the trial court properly refused the above instruction. The fraud instruction that the court gave adequately informed the jury of the law on the issues that were to be decided given the evidence presented.

Defendants next argue that the trial court should have instructed the jury that American Snack Foods could be entitled to nominal damages for fraud under count III of its counterclaim. Defendants tendered a lengthy instruction which informed the jury that if it found no actual damage was suffered, it could award nominal damages. Plaintiffs objected to the itemization of the damages for which American Snack Foods was to be awarded an amount of money or acknowledgment of nominal damages. The trial judge refused the instruction because it was not an Illinois pattern instruction and the judge felt the instruction contained misstatements of law.

■■ A party may be awarded nominal damages for the recognition of a violation of his or her legal rights. (*Redding v. Fairman* (7th Cir. 1983), 717 F.2d 1105, 1119.) In an action for fraud, damages may not be predicated on mere speculation and must be a proximate consequence of the fraud. (*Brown v. Broadway Perryville Lumber Co.* (1987), 156 Ill. App. 3d 16, 25.) Here, the evidence of fraud was insufficient to necessitate such an instruction; thus, the trial court's refusal was not error. See *Kemnitz v. Semrad* (1990), 206 Ill. App. 3d 668, 673.

Defendants last contend that the trial court erred in refusing defendants' revised instruction No. 10, which read:

"According to the terms of the lease, the plaintiff was required to satisfy the following duties before the defendant was required to perform its duties:

1. to deliver the premises in good condition and repair

2. to deliver the premises with an upgraded and overhauled refrigeration system in A#1 working condition; and

3. to deliver the premises with a roof in first class condition.

There is no dispute in this trial that the contract provided these duties."

We note that part (1) of the instruction is taken directly from section 20.22 of the lease, while parts (2) and (3) of the instruction are based on Leahy's judicial admissions in his discovery deposition concerning what his duties under the lease were. Defendants argue such an instruction is necessary to guide the jury on how they were to construe Leahy's admissions together with the language in the lease.

The trial court properly refused this instruction since the phrase "[a]ccording to the terms of the lease" incorrectly implies that all three factors are contained in the lease. Defendant was able to bring out on cross-examination the inconsistency between Leahy's agreement under section 20.22 of the lease and its deposition testimony. However, the structure of this proposed instruction was misleading and was properly refused since it would have tended to misinform the jury. See *Oak Brook Park District*, 170 Ill. App. 3d 221.

For the foregoing reasons, we reverse the judgment of the circuit court of Lake County and remand the cause for a new trial.

Reversed and remanded.

BOWMAN and QUETSCH, JJ., concur.