JAMESON REALTY GROUP, Plaintiff-Appellee, v. LEWIS KOSTINER, Defendant-Appellant.

First District (4th Division)    No. 1—03—2914

Opinion filed July 29, 2004.

418

Vurdelja & Heaphy, of Chicago (George N. Vurdelja, Jr., of counsel), for appellant.

Schain, Burney, Ross & Citron, Ltd., of Chicago (Jerome Wiener and Timothy J. McGonegle, of counsel), for appellee.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

This appeal concerns, *inter alia*, the validity of a liquidated damages clause in a real estate brokerage contract under which a broker sought to recover damages against a seller who prematurely terminated an exclusive listing agreement with the broker. For the following reasons, we hold that the provision is valid and affirm the judgment of the circuit court.

## BACKGROUND

In March 1998, defendant Lewis Kostiner hired plaintiff Jameson Realty Group (Jameson) to sell the remaining condominium units in an apartment building located at 850 West Adams Avenue in Chicago. According to the "Exclusive Listing Agreement" (Agreement), Jameson received the "sole and exclusive right to sell" the units from April 1, 1998, until March 31, 1999. Jameson was to receive a commission of 5% in the event it produced a buyer "ready, willing, and able" to purchase the units. "Anna Robertson/Carl Mandenberg, sales associates affiliated with Jameson," were listed as Kostiner's "exclusive designated legal agents."

The Agreement contained two clauses that are relevant here on appeal. The first, a liquidated damages clause, stated:

"If Broker's authority to sell is revoked or said property is withdrawn from the market during the period of Broker's authority to sell hereunder, Seller shall pay Broker upon such revocation or withdrawal, not as a penalty, but as liquidated damages, an amount equal to the commission payable on the full price listed above.

No amendment or alteration with respect to the amount of commission or time of payment of commission shall be valid or binding unless made in writing and signed by the parties hereto."

The Agreement itself did not contain any "full price" upon which to base Jameson's commissions. Instead, it referred to an attached list, which was signed and dated by Kostiner and contained the price for each individual unit.

The Agreement also contained an arbitration clause, which stated:

"The parties hereby agree that any dispute, controversy, or claim arising out of or relating to this exclusive listing agreement, or any breach thereof by either party, shall be resolved by arbitration in accordance with the Code of Ethics and Arbitration Manual of the National Association of REALTORS, as amended from time to time, through the facility of the Chicago Association of REALTORS. The parties agree to be bound by any award rendered by any professional standards arbitration hearing panel of the Chicago Association of REALTORS and further agree that judgment upon any award rendered by a professional standard arbitration hearing panel of the Chicago Association of REALTORS may be entered in any court having jurisdiction thereof. The parties agree to execute any arbitration agreements and documents as may be required by the Chicago Association of REALTORS to facilitate any arbitration."

Kostiner signed the agreement and, in the space labeled "Seller," provided his home and work telephone numbers as well as his social

security number. Nothing in the Agreement indicated that Kostiner was acting as an agent for another entity.

A few days after signing the Agreement, an incident occurred between Kostiner and Anna Robertson. After the incident, Ms. Robertson told Jameson's president, Charles Huzenis, that Kostiner had been "abusive and rude" to her and that she refused to work on the project. When Mr. Huzenis told Kostiner that Ms. Robertson had quit, "[Kostiner] laughed like he didn't even understand; that he was just laughing about it. He said, 'fine; let's go on, get somebody else.' " As a result, Jameson assigned another agent, Chris Anderson, to take Ms. Robertson's place.

Five and one-half months later, after four units had been sold and thirteen units were still unsold, Kostiner terminated the Agreement. On December 10, 1998, seeking to have the matter arbitrated before a grievance committee of the Chicago Association of Realtors (Committee), Jameson filed a complaint requesting commissions for the 13 unsold units and 14 unsold parking spaces, marketing expenses, and commissions for the four units that had been sold prior to the termination. The "Request and Agreement to Arbitrate" Jameson filed with the Committee stated:

> "I request and consent to arbitration through the Board in accordance with its *Code of Ethics and Arbitration Manual* ***, and I agree to abide by the arbitration award and to comply with it promptly.
>
> In the event I do not comply with the arbitration award and it is necessary for any party to this arbitration to obtain judicial confirmation and enforcement of the arbitration award against me, I agree to pay the party obtaining such confirmation the costs and reasonable attorney's fees incurred in obtaining such confirmation and enforcement."

On June 16, 1999, the Committee informed Jameson that "[i]t was the decision of [the] Committee to dismiss this case as it fails to merit further consideration."

On June 29, 1999, Jameson appealed the Committee's decision. Granting the appeal, the Committee allowed Jameson to file an amended complaint regarding only three of the four units that were sold prior to the termination. In its amended complaint, Jameson reserved "its right to file a Complaint in the Circuit Court of Cook County regarding the claims in its initial Request for Arbitration which the Chicago Association of Realtors [would] not consider," which it did later that same day, filing a complaint for breach of contract against Kostiner in the circuit court.

On January 20, 2000, Kostiner filed a motion to dismiss Jame-

son's complaint. Kostiner argued that Jameson's claims had been dismissed by the Committee, Jameson had failed to properly appeal that decision, and Jameson's complaint was not timely filed pursuant to the Illinois Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2000)). The circuit court denied Kostiner's motion.

Meanwhile, the Committee set an arbitration hearing date of March 16, 2000. Two days before the arbitration was to take place, however, Kostiner's attorney sent a letter to the Committee declining to participate in the arbitration. The letter stated:

"[T]his matter [the pending arbitration] is to be heard on a voluntary basis. If I correctly understand this, Mr. Kostiner must therefore voluntarily submit to the arbitration. To date, he has not done so; and we do not anticipate, at this time, submitting to such arbitration.

\* \* \*

It may be that my client will, at a later time, decide to voluntarily submit to the arbitration request, and we reserve the right to do so; but until such time, we must respectfully decline the current invitation to arbitrate this matter."

According to Jameson's brief, after receiving this letter, the Committee cancelled the arbitration hearing and "closed the matter."

On April 5, 2000, Jameson filed a five-count amended complaint against Kostiner for breach of contract in which it sought recovery under the liquidated damages clause of the Agreement (count I), commissions for three units it had sold prior to the termination of the Agreement (counts II through IV), and reimbursement for its marketing expenses (count V). The circuit court ordered Kostiner to file an answer and any counterclaim on or before May 29, 2000. On May 30, 2000, Kostiner filed his answer, which did not contain a counterclaim.

On July 10, 2001, the circuit court granted Jameson's motion for partial summary judgment, finding that the liquidated damages clause was enforceable.

On September 19, 2001, nearly 1½ years after the deadline set by the circuit court, Kostiner requested leave to file a three-count counterclaim (breach of contract, violation of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 *et seq.* (West 2000)) (Consumer Fraud Act), and breach of fiduciary duty) against Jameson and attempted to add 844 West Adams, L.L.C., as a party. On December 7, 2001, the circuit court, in a written memorandum order, denied his motion, stating: (1) it was untimely "as it [came] more than a year and a half after the filing of the answer and there [was] no allegation that [Kostiner was] somehow unaware of the damage [he] allegedly suffered until this late date in the preparation for trial";

(2) Jameson would suffer prejudice due to "the late nature of the claim and additional discovery required"; and (3) "most importantly, the counterclaim would in no way further the ends of justice and is simply untenable because it improperly attempts to add '844 West Adams, L.L.C.' as a counter-plaintiff without any legal basis for doing so." The court also found that Kostiner's consumer fraud claim was "merely a breach of contract claim masquerading as a fraud claim."

On March 25, 2002, Kostiner filed a three-count complaint against Jameson in the chancery division. Just as in his rejected counterclaim, Kostiner alleged claims for breach of contract, violation of the Consumer Fraud Act, and breach of fiduciary duty. The case was transferred to the law division and consolidated with the original pending action. The circuit court then granted Jameson's motion to dismiss Kostiner's three-count complaint, finding that "[t]he Chancery Complaint contains the same allegations that this court denied leave to file in the counterclaim." The court found that Jameson had "stated sufficient facts to support a laches defense in this case, in addition to 'law of the case.' " The court further found that because "the parties have already engaged in discovery," any further delay which would result "from the adjudication of the Chancery Complaint" would prejudice Jameson.

After the circuit court granted Jameson's motions for summary judgment for counts II through V, a bench trial was held on count I (liquidated damages). After trial, the court found that Jameson had used its "best efforts" to sell the units as required under the Agreement, Kostiner had breached the agreement, and Kostiner was personally liable for the liquidated damages owed to Jameson. The court then awarded Jameson damages in the amount of $261,820. Kostiner timely filed a notice of appeal.

## ANALYSIS

On appeal, Kostiner argues (1) the liquidated damages clause in the Agreement was simply a penalty and, thus, not enforceable; (2) the arbitration clause contained in the Agreement was binding and, therefore, the circuit court erred in not granting his motion to dismiss on that basis; (3) Jameson breached the Agreement by not having Anna Robertson act as the exclusive selling agent and was, therefore, not entitled to recover under the liquidated damages clause; (4) he, as agent of 844 West Adams, L.L.C., is not personally liable for the judgment entered by the circuit court; and (5) the circuit court improperly dismissed his chancery complaint.

### I. LIQUIDATED DAMAGES CLAUSE

Kostiner contends that the liquidated damages provision in the

Agreement was merely a penalty provision and, therefore, unenforceable. Specifically, he argues (1) the parties never discussed this provision before signing the Agreement, (2) there was "no specified amount contained in the purported liquidated damages clause," and (3) "[t]he percentage amount referenced [in the liquidated damages clause] did not bear any relationship to the damages that might be sustained."

■ It is a general rule of contract law that, for reasons of public policy, a liquidated damages clause that operates as a penalty for nonperformance or as a threat to secure performance will not be enforced. See *Med+Plus Neck & Back Pain Center v. Noffsinger*, 311 Ill. App. 3d 853, 860, 726 N.E.2d 687 (2000); *Grossinger Motorcorp, Inc. v. American National Bank & Trust Co.*, 240 Ill. App. 3d 737, 749, 607 N.E.2d 1337 (1992). Although the public policy behind this rule has never been explained clearly (see *XCO International Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1001 (7th Cir. 2004) (questioning why courts should bother themselves with determining whether such clauses are reasonable estimates of damages or mere penalties)), under Illinois law, a liquidated damages provision will be enforced if it satisfies the test outlined in section 356 of the Restatement (Second) of Contracts:

> " 'Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.' " *Penske Truck Leasing Co., L.P. v. Chemetco, Inc.*, 311 Ill. App. 3d 447, 454, 725 N.E.2d 13 (2000), quoting Restatement (Second) of Contracts § 356 (1979).

From the Restatement, our courts have parsed three elements that must be met in order to validate such a clause:

> " '(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove.' " *Noffsinger*, 311 Ill. App. 3d at 860, quoting *Grossinger*, 240 Ill. App. 3d at 749.

"There is no fixed rule applicable to all liquidated-damages agreements, and each one must be evaluated on its own facts and circumstances." *Penske Truck Leasing Co.*, 311 Ill. App. 3d at 454, citing *Likens v. Inland Real Estate Corp.*, 183 Ill. App. 3d 461, 539 N.E.2d 182 (1989). When determining whether actual damages would be uncertain in amount and difficult to prove, however, courts must look to "the time of contracting, not the time of breach." Restatement

(Second) of Contracts § 356, Comment *b* (1979). Additionally, the damages contained in a liquidated damages clause must be for a specific amount for a specific breach; the provision may not merely serve as a threat to secure performance or as a means to punish nonperformance. See *Noffsinger*, 311 Ill. App. 3d at 860. Although exculpatory language in the contract stating that the liquidated damages provision is not a penalty does not control, it should be given some weight. See *Penske Truck Leasing Co.*, 311 Ill. App. 3d at 455. The validity of a liquidated damages provision is a question of law and, therefore, is reviewed *de novo*. See *Penske*, 311 Ill. App. 3d at 454.

Numerous cases exist in which the validity of such provisions are determined in the context of a "real estate sales contract," *i.e.*, where either a buyer or seller of land sought liquidated damages because the other backed out of an impending real estate transaction (see *Jones v. Hryn Development, Inc.*, 334 Ill. App. 3d 413, 417-18, 778 N.E.2d 245 (2002); *Hickox v. Bell*, 195 Ill. App. 3d 976, 987-88, 552 N.E.2d 1133 (1990); *Morris v. Flores*, 174 Ill. App. 3d 504, 506-07, 528 N.E.2d 1013 (1988); *Curtin v. Ogborn*, 75 Ill. App. 3d 549, 554-55, 394 N.E.2d 593 (1979); *First National Bank & Trust Co. of Barrington v. Maas*, 26 Ill. App. 3d 733, 738-39, 327 N.E.2d 205 (1975)); however, no case in Illinois has been cited or found in which such a provision was construed in the "real estate brokerage contract" context, *i.e.*, where a broker sought to recover liquidated damages from a seller who prematurely terminated an exclusive listing agreement.

■ In the real estate sales contract context, where the requisite three elements are met, courts will generally enforce the liquidated damages provision. See *Leahy Realty Corp. v. American Snack Foods Corp.*, 253 Ill. App. 3d 233, 244, 625 N.E.2d 956 (1993); *Morris*, 174 Ill. App. 3d at 506; *Curtin*, 75 Ill. App. 3d at 554-55. The issue here is whether such a provision should be treated differently simply because it is found in a real estate brokerage contract. Although the two contracts are different in nature, the former being a contract for the sale of real property and the latter being a contract for the services of a broker in connection with the sale of real property, there is no reason to treat a liquidated damages provision in a real estate brokerage contract differently.

The foregoing view is in accord with courts from other jurisdictions that have considered the validity of a liquidated damages clause in a real estate brokerage contract. See *CMG Realty of Connecticut, Inc. v. Colonnade One at Old Greenwich Ltd. Partnership*, 36 Conn. App. 653, 667, 653 A.2d 207, 215 (1995) (finding that a provision requiring the seller to pay the broker $50,000 if termination occurred before 84 units had been sold and $100,000 if termination occurred

after 84 had been sold was an unenforceable penalty because $50,000 was not related to any amount of damage that the broker would actually suffer in the event of a breach and because the doubling of the fee, dependent upon the amount of units that had been sold, could only serve to threaten the seller not to terminate the listing agreement); *DiTommaso Realty, Inc. v. Moak Motorcycles, Inc.*, 96 Or. App. 431, 434-35, 773 P.2d 391, 392-93 (1989) (finding valid a provision that provided the broker with its 10% commission if the seller prematurely terminated the exclusive listing agreement); *Larson-Hegstrom & Associates, Inc. v. Jeffries*, 145 Ariz. 329, 333-34, 701 P.2d 587, 591-92 (App. 1985) (applying the Restatement (Second) of Contracts § 356 (1979), and finding enforceable a clause that provided the broker its 6% commission if the seller terminated the exclusive listing agreement before the end of the listing period).

The above-cited cases demonstrate two propositions: First, there is no reason to treat a liquidated damages clause in a real estate brokerage contract any differently than one found in any other contract. The uncertainty of actual damages at the time of contract, a fact that must be true for a liquidated damages clause to be valid and enforceable (see *Noffsinger*, 311 Ill. App. 3d at 860), is inherent in a real estate brokerage contract context. See *Larson-Hegstrom & Associates, Inc. v. Jeffries*, 145 Ariz. 329, 334, 701 P.2d 587, 592 (App. 1985). As the Arizona Court of Appeals stated in *Jeffries*:

> "Compensation associated with real estate contracts is by its nature difficult to estimate since what is being compensated is the presentation of a ready, willing and able buyer, regardless of any real effort or expenditures on the part of the agent. When the seller unilaterally withdraws the property from the hands of its agent and conveys it himself, he has deprived the agent of his *opportunity* to present the requisite buyer under the terms of the agency." (Emphasis in original.) *Jeffries*, 145 Ariz. at 334, 701 P.2d at 592.

Further, one of the benefits that a liquidated damages clause provides to contracting parties and courts alike is:

> "When damages for breach of contract would be difficult for a court to determine after the breach occurs, it makes sense for the parties to specify in the contract itself what the damages for breach shall be; this reduces uncertainty and litigation costs and economizes on judicial resources as well." *XCO International Inc.*, 369 F.3d at 1001.

Thus, the real estate brokerage contract context offers an ideal setting for such a clause.

Second, those clauses that base the amount of liquidated damages upon the broker's bargained-for commission, as opposed to some

estimate of damages made from whole cloth, will be upheld as a reasonable estimate of damages. Compare *CMG Realty of Connecticut, Inc.*, 36 Conn. App. at 667, 653 A.2d at 215 (finding a provision requiring the seller to pay the broker $50,000 if termination occurred before 84 units had been sold and $100,000 if termination occurred after 84 had been sold was an unenforceable penalty), with *DiTommaso Realty, Inc.*, 96 Or. App. at 434-35, 773 P.2d at 392-93 (finding valid a provision that provided the broker with its 10% commission if the seller prematurely terminated the exclusive listing agreement), and *Jeffries*, 145 Ariz. at 333-34, 701 P.2d at 591-92 (finding enforceable a clause that provided the broker its 6% commission if the seller terminated the exclusive listing agreement before the end of the listing period). Therefore, applying liquidated damages clause principles under Illinois law, as well as cases from other jurisdictions construing such clauses in the real estate brokerage contract context, the liquidated damages clause in this case was valid for the following reasons.

■ First, the liquidated damages provision was clear and unambiguous on its face, which demonstrates that " 'the parties intended to agree in advance to the settlement of damages that might arise from the breach.' " *Noffsinger*, 311 Ill. App. 3d at 860, quoting *Grossinger*, 240 Ill. App. 3d at 749. Where the terms of an agreement are unambiguous, the parties' intent must be determined solely from the language of the agreement itself, and it is presumed that the parties inserted each provision deliberately and for a purpose. See *Bennett & Kahnweiler, Inc. v. American National Bank & Trust Co. of Chicago*, 235 Ill. App. 3d 896, 905, 601 N.E.2d 810 (1992).

During negotiations with Jameson, Kostiner struck and added provisions in the Agreement (a form contract), including a provision that reduced Jameson's commission to 2% if the buyer was a tenant of "Annie Properties." As an experienced developer of residential real estate, Kostiner cannot reasonably argue that he was not aware either of the presence or import of this provision.

Second, the amount of damages was specified in the Agreement. Kostiner's argument to the contrary notwithstanding, it is clear that the amount of liquidated damages was to equal 5% of the original asking price for each unit that had not been sold at the time of breach. An attached list contained the original asking price for each unit, a list that was explicitly referenced in the Agreement and signed and dated by Kostiner himself.

Third, at the time the Agreement was signed, the amount of damages to be paid under the liquidated damages provision bore a reasonable relationship to the damage Jameson might suffer if Kostiner wrongfully terminated the Agreement. Under the terms of the Agree-

ment, Jameson was to receive a commission of 5% of the purchase price for each unit sold. If Kostiner terminated the Agreement, Jameson would lose any chance at obtaining that commission; Kostiner would have "deprived [Jameson] of [its] *opportunity* to present the requisite buyer under the terms" of the Agreement. (Emphasis in original). *Jeffries*, 145 Ariz. at 333-34, 701 P.2d at 592. Therefore, the liquidated damage clause simply provided Jameson, which the circuit court found had used its best efforts in marketing the units for Kostiner, with an amount equal to what it would have received had it been afforded the opportunity to sell the units. See *DiTommaso Realty, Inc.*, 96 Or. App. at 434-35, 773 P.2d at 392-93; *Jeffries*, 145 Ariz. at 333-34, 701 P.2d at 591-92.

Kostiner contends that Jameson received a "tremendous windfall" through the circuit court's award of liquidated damages because it obtained "the maximum profit it could have obtained if it had sold all the units, plus the time value of its services." Kostiner argues that Jameson most likely would have been required to split any commission with the buyer's broker, unless it also represented the buyer in the sale of the unit, and that, by awarding commissions on all the unsold units at the time of termination, the clause assumed that Jameson would have sold all of the units during the exclusive listing period provided under the Agreement.

Kostiner's arguments, however, prove the validity of the clause; they show just how uncertain and difficult calculating actual damages was at the time of contracting. See *Noffsinger*, 311 Ill. App. 3d at 860, quoting *Grossinger*, 240 Ill. App. 3d at 749 (stating one factor in determining the validity of such a clause is whether " 'actual damages would be uncertain in amount and difficult to prove' "). Therefore, the liquidated damages clause here was valid and enforceable.

## II. THE ARBITRATION CLAUSE

Kostiner next argues, without citing any case law, that the Committee's initial dismissal of Jameson's arbitration claim "as being without merit" entitles him "to judgment in his favor on the basis of the prior ruling in the arbitration," although he does not explain under what legal theory he was entitled to that judgment.

■ Arbitration is a matter of contract, and a party cannot be required to arbitrate any dispute to which he or she has not agreed. See *Hutcherson v. Sears Roebuck & Co.*, 342 Ill. App. 3d 109, 116, 793 N.E.2d 886 (2003). When determining whether a particular dispute is subject to arbitration, our courts apply a more stringent test to disputes which arise from commercial activities than disputes which arise from collective bargaining agreements. *Kennedy v. Commercial*

*Carriers, Inc.*, 258 Ill. App. 3d 939, 943, 630 N.E.2d 1059 (1994). The applicable standard of review for a commercial arbitration dispute provides, in essence, that the parties are held bound only to arbitrate those issues which are " 'stated in the contract between the parties in crystal clear language unextended and unenlarged either by construction or by implication.' " *Lehman v. Eugene Matanky & Associates, Inc.*, 107 Ill. App. 3d 985, 989, 438 N.E.2d 614 (1982), quoting *Flood v. Country Mutual Insurance Co.*, 41 Ill. 2d 91, 94, 242 N.E.2d 149 (1968). " 'This [standard of review] has almost led to the requirement that the settling of a dispute by the method of arbitration must be spelled out *expressis verbis* in the contract in order to give it effectiveness.' " *Lehman*, 107 Ill. App. 3d at 989, quoting F. Herzog, *Judicial Review of Arbitration Proceedings—A Present Need*, 5 DePaul L. Rev. 14, 19 (1955).

The arbitration clause in this case stated:

> "The parties hereby agree that any dispute, controversy, or claim arising out of or relating to this exclusive listing agreement, or any breach thereof by either party, shall be resolved by arbitration in accordance with the Code of Ethics and Arbitration Manual of the National Association of REALTORS."

Based upon the plain language of the Agreement, the parties agreed to arbitrate any dispute arising from a breach of the Agreement and to be bound by the Committee's award. Jameson initiated the arbitration, yet Kostiner argues Jameson then disregarded the language of the Agreement by filing suit in the circuit court after the Committee dismissed his original arbitration claim for failing "to merit further consideration."

Whatever merit Kostiner's argument may have had, however, was obviated by the letter his attorney sent to the Committee, which made clear both his belief that the arbitration was "voluntary" and his intent not to submit to that arbitration. Nothing in the record indicates that Kostiner ever participated in the arbitration and the letter sent by his attorney confirms this: "To date, he has not [participated in the voluntary arbitration]; and we do not anticipate, at this time, submitting to such arbitration." Kostiner cannot be permitted to deem the arbitration "voluntary" and refuse to participate and then, on appeal, argue that it was binding. We find that Kostiner waived his right to arbitration. See *Bishop v. We Care Hair Development Corp.*, 316 Ill. App. 3d 1182, 1191, 738 N.E.2d 610 (2000) (noting that, even though "there is a presumption in Illinois law against waiver," a contractual right to arbitrate can be waived as with any other contract right "when a party's conduct is inconsistent with the arbitration clause, thus indicating an abandonment of the right to arbitration").

## III. JAMESON'S PERFORMANCE UNDER THE AGREEMENT

■ Kostiner next argues that Jameson breached the Agreement when Ms. Robertson, who, along with Carl Mandenberg, was characterized in the Agreement as a "sales associate(s) affiliated with" Jameson and Kostiner's "exclusive designated legal agent(s) under [Kostiner's] Exclusive Listing Agreement," quit the project. Based upon Jameson touting Ms. Robertson as one of its top sales people, Kostiner claims that he would not have signed the Agreement if she had not been the designated broker for the project. He contends, therefore, that he was entitled to terminate the contract.

Kostiner argues that he was denied the benefit of the bargain, *i.e.*, Ms. Robertson's services, when she quit and that he was, therefore, entitled to terminate the Agreement. It was Kostiner's "rude and arrogant" behavior, however, which caused her to quit in the first place. By acting in this manner, Kostiner not only breached his duty under the Agreement to "cooperate fully" with Jameson, but also his duty to act in good faith. See *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 473, 809 N.E.2d 180, 193 (2004) (stating that "[e]very contract contains [an] implied promise of good faith and fair dealing between the contracting parties"), citing Restatement (Second) of Contracts § 205 (1981).

Moreover, in reviewing the "four corners" of the Agreement, it is clear that Ms. Robertson's departure from the project did not cause Jameson to breach the Agreement. See *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882 (1999) (outlining the traditional rules of contract interpretation known collectively as the "four corners" rule). Under the terms of the Agreement, both Ms. Robertson and Carl Mandenberg were listed as sales agents assigned to the project. There is nothing in the Agreement which indicates that only Ms. Robertson would be Jameson's designated sales agent on the project or that Kostiner would have the right to terminate the Agreement if she were not working on the project.

Finally, even if her quitting the project entitled him to terminate the Agreement, Kostiner waived that right. First, according to the testimony of Jameson's president, Charles Huzenis, when told that she had quit, Kostiner "laughed like he didn't even understand; that he was just laughing about it. He said, 'fine; let's go on, get somebody else.'" Second, Kostiner waited six months after Ms. Robertson quit the project before he terminated the Agreement. Thus, even if the Agreement could be characterized as a contract for the services of Ms. Robertson, Kostiner waived any right to her services by acquiescing in her substitution as sales agent. See *Wolfram Partnership, Ltd. v. La Salle National Bank*, 328 Ill. App. 3d 207, 223-24, 765 N.E.2d 1012

(2001) (stating that a party may not lull "another into a false belief that strict compliance with a contractual obligation will not be required and then [sue] for noncompliance").

## IV. KOSTINER'S PERSONAL LIABILITY

■ Kostiner next argues that he should not be liable personally for the judgment entered by the circuit court because he was merely the agent for 844 West Adams L.L.C., the true owner of the properties subject to the Agreement. He contends that "although [he] had a 25% interest in 844 [West Adams] L.L.C. and executed the Agreement, he could only have done so as the Manager, on behalf of 844 [West Adams] L.L.C., and by authority granted to him."

An agent who contracts with a third party on behalf of an undisclosed or partially disclosed principal is liable personally on the contract. *Kimco Corp. v. Murdoch, Coll & Lillibridge, Inc.*, 313 Ill. App. 3d 768, 772, 730 N.E.2d 1143 (2000), citing *Mawer-Gulden-Annis, Inc. v. Brazilian & Colombian Coffee Co.*, 49 Ill. App. 2d 400, 404, 199 N.E.2d 222 (1964); see also *Gillet v. New Market Savings Bank*, 7 Ill. App. 499 (1880) (stating that where an agent signs a note with his own name alone and there is nothing on the face of the instrument to show that he was acting as agent, he will be personally liable). The reason for the rule is reliance; the third party is obviously relying on the credit of the agent and not that of the principal when the agent is contracting on behalf of an undisclosed principal. *Kimco*, 313 Ill. App. 3d at 772. Agents are not unfairly burdened by this rule because:

"If the agent would avoid personal liability, the duty is on him to disclose his principal; it is not upon the party with whom the agent deals to discover the principal. There is no hardship in this rule of liability against agents who do not disclose their principals; they always have it in their power to relieve themselves from such liability, and when they do not, it must be presumed that they intend to be liable." 3 Am. Jur. 2d *Agency* § 325 (1986).

There is nothing on the face of the Agreement that would indicate Kostiner was acting as an agent when he contracted with Jameson for its services. Under the section marked "Seller," Kostiner signed his name, listed both his home and work phone numbers, and included his social security number. To rebut this, Kostiner points out that he owned only 25% of 844 West Adams L.L.C., he signed the Agreement simply as "the Manager," and language in two sales contracts for units sold after the Agreement was entered into proves that he was merely acting as an agent. This, however, is all extrinsic evidence. Since there is no ambiguity in the Agreement as to whether Kostiner was acting on his own behalf or as an agent, such extrinsic evidence simply cannot be considered. See *Nebel, Inc. v. Mid-City National*

*Bank of Chicago*, 329 Ill. App. 3d 957, 968, 769 N.E.2d 45 (2002) (stating that "[c]ontract language that is facially unambiguous is interpreted without the use of parol evidence"), citing *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882 (1999); see also *Bank of Pawnee v. Joslin*, 166 Ill. App. 3d 927, 935, 521 N.E.2d 1177 (1988) (stating that "where an agent signs a contract in his own name and the contract nowhere mentions the existence of an agency or the identity of the principal, parol evidence is not admissible to denounce the agent's personal liability").

## V. KOSTINER'S CHANCERY CLAIM

■ Kostiner argues that the circuit court improperly dismissed his chancery claim under theories of *laches* and law of the case because neither was applicable. He contends that *laches* is not applicable because "it is an affirmative defense that must be pleaded and proven by fact [and] is not a basis for striking a complaint." He also contends that the law of the case principal was not relevant because "(1) the 2002 Chancery case was a new case; (2) the trial court's ruling on the 1999 counterclaims was interlocutory and not final; (3) the court's decision in the 1999 case was not a ruling on the merits for any claim other than the consumer fraud claim; and (4) the 'law of the case' doctrine does not prevent a trial court from changing its own orders."

The sequence of events leading to the dismissal of Kostiner's chancery complaint is as follows:

1. The circuit court set a deadline of May 29, 2000, for Kostiner to file his answer and counterclaim.

2. On May 30, 2000, Kostiner filed his answer without any counterclaim.

3. On October 4, 2000, Kostiner filed an amended answer that also did not include any counterclaim.

4. On September 13, 2001, Kostiner sought leave to file a three-count counterclaim against Jameson for breach of contract, violations of the Consumer Fraud Act, and breach of fiduciary duty.

5. On December 7, 2001, the circuit court denied Kostiner's motion to file a counterclaim because, *inter alia*, it was untimely.

6. On March 25, 2002, Kostiner filed a three-count complaint against Jameson in chancery court alleging breach of contract, violations of the Consumer Fraud Act, and breach of fiduciary duty; a complaint that was essentially the same as his rejected counterclaim.

7. After consolidating the chancery case with the law division case, the circuit court granted Jameson's motion to dismiss the chancery complaint on October 8, 2002.

The two fundamental elements of *laches* are (1) a lack of due

diligence by the party asserting the claim and (2) prejudice to the opposing party. *Gersch v. Department of Professional Regulation*, 308 Ill. App. 3d 649, 661, 720 N.E.2d 672 (1999). The defense of *laches* may be considered on a motion to dismiss a complaint if its applicability appears from the face of the complaint or by affidavit submitted with the motion. See *Summers v. Village of Durand*, 267 Ill. App. 3d 767, 770-71, 643 N.E.2d 272 (1994); *People ex rel. First National Bank of Chicago v. City of North Chicago*, 158 Ill. App. 3d 85, 97, 510 N.E.2d 577 (1987). We review *de novo* the circuit court's dismissal of Kostiner's chancery complaint based upon the doctrine of *laches*. See *Hadley v. Ryan*, 345 Ill. App. 3d 297, 301, 803 N.E.2d 48 (2003); *Summers*, 267 Ill. App. 3d at 771.

Certainly, Kostiner was not diligent in filing either his counterclaim or his chancery complaint. He initially attempted to file his counterclaim over a year after the circuit court's deadline for doing so. He then filed his chancery complaint nearly 4 1/2 years after the Agreement was terminated and 2 1/2 years after Jameson had filed its complaint against Kostiner. Moreover, at the time Jameson's motion to dismiss was pending, discovery in the initial law division case had closed. Had it not dismissed the chancery complaint, the circuit court would have been obligated to reopen discovery.

Therefore, based upon Kostiner's clear lack of due diligence and the prejudice Jameson's would have incurred, the circuit court properly dismissed Kostiner's chancery complaint based upon the doctrine of *laches*.

Affirmed.

HARTMAN and GREIMAN, JJ., concur.