2023 IL App (1st) 221112

FIFTH DIVISION
September 29, 2023

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-22-1112

| | | |
|---|---|---|
| H. MERRILL MATSCHKE, M.D., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2019-CH-13709 |
| | ) | |
| UROPARTNERS, LLC, and UROPARTNERS | ) | Honorable |
| INVESTMENTS, LLC, | ) | Caroline K. Moreland, |
| | ) | Judge Presiding |
| Defendants-Appellees. | ) | |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Lyle and Navarro concurred in the judgment and opinion.

**OPINION**

¶ 1    The plaintiff in this case, Dr. H. Merrill Matschke, appeals from the Cook County circuit court's grant of summary judgment in favor of defendants, Uropartners, LLC, and Uropartners Investments, LLC (collectively, Uropartners), ruling that a provision in the parties' contract was enforceable. Dr. Matschke argues that the court erred because (1) the provision is an unenforceable liquidated damages clause, (2) the provision is an unreasonable restraint on trade, (3) Uropartners waived strict compliance with the provision, and (4) his failure to comply with the provision was a mere technical and inadvertent violation of the parties' agreement that was promptly cured. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     The following facts are taken from the parties' pleadings and submissions supporting their cross-motions for summary judgment.

¶ 4                         A. Dr. Matschke's Involvement with Uropartners

¶ 5     Dr. Matschke is a urologist and a founding member of Uropartners, a urology group conducting business throughout the Chicagoland area. Dr. Matschke made an initial capital contribution in exchange for a membership interest in the business and agreed to be bound by Uropartners' amended and restated operating agreement, dated October 1, 2017 (Operating Agreement).

¶ 6     Section 9.7 of the Operating Agreement contains a global nonsolicitation and covenant not to compete clause that is not directly at issue here. Members agree not to practice urological medicine within a five-mile radius of any of Uropartners' 16 "Strategic Business Units" (SBUs) for a period of 24 months following the termination of their membership. Members agree that injunctive relief is appropriate in the event of a breach of this provision and that such a breach may be remedied only by extending the time restriction "by a period equal to the length of time from the commencement of any such violation until such time as [the] violation is cured."

¶ 7     Section 10.6 of the Operating Agreement is the basis for this dispute. Subsection (a) establishes the price Uropartners will pay to redeem a withdrawing member's units of ownership, divided into an "SBU Purchase Price" and a "Common Purchase Price." Subsection (b)(ii) provides that, if "at any time during the 2-year period following the Closing Date, the Redeeming Member engages in the practice of medicine on a full-time or part-time basis, within the Company Service Area, for any person or entity other than the Company," then the redeeming member will forfeit the common purchase price that would otherwise be credited to them upon withdrawal from

the practice. The "Company Service Area" is defined as "a 30-mile radius of any of the Company's offices in existence as of the applicable Closing Date," the closing date being the date chosen by Uropartners for the closing of any repurchase of a redeeming member's units of ownership.

¶ 8    Dr. Matschke notified Uropartners in mid- to late 2017 that, beginning in January 2018, he would be separating from the practice and moving to South Carolina. On April 12, 2018, Uropartners sent Dr. Matschke a letter confirming certain details regarding the redemption of his ownership interests in the companies. It stated that Uropartners accepted the redemption of his membership interests in the companies, effective December 31, 2017. The letter informed Dr. Matschke that he was owed $177,071 for his interest in Uropartners, LLC, which included an SBU purchase price of $34,307 and a common purchase price of $142,764. He was also entitled to $60,801 for his interest in Uropartners Investments, LLC, and a severance fee of $267,237. These amounts would be offset by his debt obligation of $266,927 and a $5000 assessment for attorney and accountant fees incurred in connection with the redemption. After those amounts were deducted, Dr. Matschke was entitled to a total of $233,192, paid in 60 monthly installments.

¶ 9    The letter reminded Dr. Matschke, under the heading "Post-Redemption Activities," that pursuant to section 10.6(b) of the Operating Agreement, "calculation of the Common Purchase Price" and "the credit [he was] receiving therefor" toward his debt obligation to the practice was "expressly conditioned upon, and subject to, his representation and warranty to Uropartners that, during the 2-year period following the Effective Date," he would "not practice urological medicine within the Company Service Area." Although section 10.6 of the Operating Agreement refers to a "Closing Date" and the redemption letter referred to an "Effective Date," it appears that these are the same. The letter further explained that, if Dr. Matschke failed to fulfill that condition, the amount of the common purchase price would not be offset against any payments still owed to him,

and if the common purchase price exceeded the amount of those payments, he would "pay back to Uropartners the amount of such deficiency." Dr. Matschke signed the letter, representing that he "agree[d] to and accept[ed] the foregoing terms" and acknowledging that the amounts set out in it "represent[ed] full and complete satisfaction of all obligations owed to [him] by Uropartners" under the Operating Agreement.

¶ 10                    B. Dr. Matschke's Practice Upon Leaving Uropartners

¶ 11    After leaving Uropartners, Dr. Matschke practiced in both South Carolina and North Carolina for approximately a year and a half, before returning to the Midwest in July 2019 to work for Aurora Health Care (Aurora) in Wisconsin. Dr. Matschke testified at his deposition that before committing to Aurora he reviewed his redemption letter and consulted the only version of the Operating Agreement in his possession, which appears from the exhibits attached to his motion for summary judgment to have been an older, 2005 version that does not include a definition of the "Company Service Area." Dr. Matschke did not inquire further into this matter. He assumed that Wisconsin would be outside of the company service area because it was a different state requiring a different license to practice medicine.

¶ 12    In fact, Dr. Matschke's new medical practice included offices in Kenosha, Wisconsin, which was within a 30-mile radius of several of Uropartners' offices in Illinois. By spring 2019, Uropartners had heard about Aurora's recruitment of Dr. Matschke; its physicians exchanged e-mails discussing his potential return to the company service area and whether he knew that, if he practiced there, he would be violating the condition in section 10.6 of the Operating Agreement. One doctor speculated that Dr. Matschke knew but did not care because of the salary he would be making and the fact that the move would benefit his family. No one at Uropartners informed Dr. Matschke of the potential ramifications of his move back to the company service area. Instead, on

4

July 9, 2019, the practice simply stopped sending Dr. Matschke the checks it had been sending him since his departure as a monthly installment on the amount he was owed by the practice.

¶ 13 Uropartners formally notified Dr. Matschke on September 18, 2019, that because he had not performed the condition set out in section 10.6(b)(ii) of the Operating Agreement and expressly acknowledged by him when he signed his redemption letter, he had not earned, and Uropartners would not apply, the $142,764 common purchase price as part of its calculation of the amount owed to Dr. Matschke after his departure.

¶ 14 Dr. Matschke alleged that, upon receipt of this notification from Uropartners and in an attempt to cure his violation of subsection 10.6(b)(ii), he stopped seeing patients and arranged to move his practice to one of Aurora's other locations—Franklin, Wisconsin—that was outside of the company service area. Dr. Matschke performed urological medical services within the company service area for just over three months, from July 15 to October 18, 2019.

¶ 15                     C. Dr. Matschke Initiates This Action

¶ 16 Dr. Matschke filed his three-count complaint for declaratory relief against Uropartners on November 26, 2019. In count I, he asked the court to declare that section 10.6(b)(ii) of the Operating Agreement was an unreasonable restraint on trade because a prohibition on practicing medicine within 30 miles of approximately 16 Uropartners locations for two years was overly broad in both temporal and geographic scope. In count II, Dr. Matschke asked the court to declare that section 10.6(b)(ii) was an unenforceable liquidated damages provision because (1) it imposed a substantial penalty that bore no relation to any damages allegedly suffered and (2) it was designed as a threat to secure performance. And in count III, Dr. Matschke asked the court to declare that Uropartners had waived any right to enforce section 10.6(b)(ii) by waiting months after it knew he intended to practice medicine within the company service area to notify him of its intent to enforce

the provision. Dr. Matschke asked the court to find that he was entitled to the full severance amount detailed in his redemption letter. Uropartners counterclaimed, asserting that Dr. Matschke had failed to perform the condition set out in section 10.6(b)(ii) of the Operating Agreement and the provision should be enforced as written.

¶ 17                    D. The Parties' Cross-Motions for Summary Judgment

¶ 18    Discovery took place throughout 2021, and the parties filed cross-motions for summary judgment in February 2022. They supported their motions with written discovery, affidavits, documentary evidence, and deposition transcripts, but the relevant facts were largely undisputed.

¶ 19    Dr. Matschke asked the court to find, as a matter of law, that section 10.6(b)(ii) was a noncompete clause that acted as an unreasonable restraint on trade and an unenforceable liquidated damages penalty. He argued that it was wrong for Uropartners to continue to refuse to pay him the common purchase price when—because he immediately moved when it was brought to his attention that he was practicing within 30 miles of a Uropartners location—Uropartners had received the full benefit of its bargain and had thus suffered no actual damages. And he faulted Uropartners for failing to inform him of the boundaries of the Company Service Area when it knew months in advance that he was planning on working there.

¶ 20    Uropartners argued that section 10(b)(ii) of the Operating Agreement was neither a restrictive covenant nor a liquidated damages provision but merely a condition for the inclusion of the Common Purchase Price in Dr. Matschke's redemption valuation that he had failed to fulfill. Because the parties' agreement contained no provision by which Dr. Matschke could "cure" that failure by agreeing not to practice within the company service area for a further period, the fact that he ultimately moved his practice outside of the service area was, in Uropartners' view, irrelevant. His waiver argument, Uropartners alleged, was also identical to an affirmative defense

of his that the court had already rejected. Specifically, the circuit court had earlier granted in part Uropartners' motion to strike Dr. Matschke's affirmative defenses, concluding that "the delay alleged against Defendants [did] not constitute any voluntary affirmative action that could constitute a waiver." Uropartners pointed out that, as a member of the practice, Dr. Matschke had previously *benefited* from enforcement of the same provision he now argued was unenforceable when another departing member was found not to have complied with section 10.6(b)(ii) upon withdrawal from the practice.

¶ 21    On July 15, 2022, the court granted Uropartners' motion and denied Dr. Matschke's. It agreed with Uropartners that the loss of the common purchase price was not intended as a liquidated damages clause but was instead a reasonable and enforceable term of the parties' agreement. The Operating Agreement made clear what Dr. Matschke must refrain from doing if he wanted to earn the common purchase price as an offset against his debt obligation, and the redemption letter specified the amount of money he would forfeit if he did not fulfill that condition. In the court's view, the Operating Agreement did not forbid Dr. Matschke from competing with Uropartners but merely set a price for doing so. The court found no reason to disregard the terms and conditions of the agreement or the redemption letter.

¶ 22    Although the court viewed section 10.6(b)(ii) as a restrictive covenant, it concluded that it was nevertheless enforceable. Noting that Illinois courts have routinely upheld restrictions that are limited both in time and geographic scope, the court observed that the restraint at issue here was for only two years and applied to only a limited geographic area. As evidence that the provision was not unreasonably onerous, the court noted that, once he learned he had violated the provision, Dr. Matschke was able to move his office outside of the company practice area and resume his practice within a relatively short period of time.

7

¶ 23    Without acknowledging its prior ruling on the affirmative defense of waiver, the court considered the issue anew in the context of the parties' motions for summary judgment, finding that Dr. Matschke failed to show conduct on Uropartners' behalf demonstrating its intentional waiver of the terms and conditions of the Operating Agreement and redemption letter. Noting that Dr. Matschke had not talked to anyone at Uropartners before deciding to practice within the company service area, the court found that the internal Uropartners e-mails produced in discovery did not show that Uropartners intentionally waived its enforcement of section 10.6(b)(ii) of the Operating Agreement. If anything, the court concluded, they showed "how Uropartners intended to aggressively enforce the Restrictive Covenant."

¶ 24    The court also rejected, as unsupported by applicable law, Dr. Matschke's argument that his violation of section 10.6(b)(ii) of the Operating Agreement was a mere technical violation and not a substantive breach of the contract.

¶ 25    The circuit court entered judgment for Uropartners and against Dr. Matschke on all three counts of his complaint and on Uropartners' counterclaim. This appeal followed.

¶ 26                                    II. JURISDICTION

¶ 27    The circuit court granted Uropartners' motion for summary judgment and denied Dr. Matschke's motion for summary judgment in an order dated July 15, 2022. Dr. Matschke timely filed his notice of appeal from that order on July 28, 2022. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 28                                    III. ANALYSIS

¶ 29    "Summary judgment is proper where the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue of material fact and the moving party is entitled to

judgment as a matter of law." *Thompson v. Gordon*, 241 Ill. 2d 428, 438 (2011). We review *de novo* an order granting or denying a motion for summary judgment. *Pielet v. Pielet*, 2012 IL 112064, ¶ 30. This is also our standard of review where Dr. Matschke has raised purely legal arguments that this provision of the Operating Agreement should not be enforced because it violates public policy. See *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 54 (2011).

¶ 30    When considering the enforceability of a contractual provision, we start with the premise that "[t]he law and the public policy of Illinois permit and require that competent parties be free to contract with one another." *Liccardi v. Stolt Terminals, Inc.*, 178 Ill. 2d 540, 549 (1997). Parties to a contract may agree to any terms they choose, so long as those terms are not contrary to some positive rule of law or "manifestly injurious" to the public welfare. (Internal quotation marks omitted.) *County of Jackson v. Mediacom Illinois, LLC*, 2012 IL App (5th) 110350, ¶ 11. Absent such a showing, when a dispute arises, we "will not rewrite a contract to suit one of the parties, but will enforce the terms as written." *Wright v. Chicago Title Insurance Co.*, 196 Ill. App. 3d 920, 925 (1990).

¶ 31    Here, Dr. Matschke contends that the circuit court erred in granting summary judgment in favor of Uropartners and against him on the question of the enforceability of section 10.6(b)(ii) of the parties' Operating Agreement. As in the circuit court, he argues that (1) the provision is an unenforceable liquidated damages clause, (2) the provision is an unreasonable restraint on trade, (3) Uropartners waived strict compliance with the provision, and (4) Uropartners should not have been granted summary judgment for a technical and inadvertent breach that was promptly cured.

¶ 32    We consider these arguments in turn.

¶ 33        A. Section 10.6(b)(ii) Is Not an Unenforceable Liquidated Damages Clause

¶ 34    We first address Dr. Matschke's argument that section 10.6(b)(ii) of the Operating

Agreement is an unenforceable liquidated damages clause. "A liquidated damages clause is the agreement of the parties as to the amount of damages which must be paid in the event of default." *Northern Illinois Gas Co. v. Energy Cooperative, Inc.*, 122 Ill. App. 3d 940, 947 (1984). Illinois courts will uphold the validity and enforceability of a liquidated damages provision when

> "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove." (Internal quotation marks omitted.) *Jameson Realty Group v. Kostiner*, 351 Ill. App. 3d 416, 423 (2004).

Dr. Matschke argues that section 10.6(b)(ii) fails to meet these criteria.

¶ 35    We agree with Uropartners, however, that these criteria are inapplicable because section 10.6(b)(ii) is simply not a liquidated damages clause. When we construe this contract, it is apparent that section 10.6(b)(ii) serves a different purpose than a liquidated damages provision, which is to compensate the injured party for a breach of contract. "The main objective of contract interpretation is to ascertain the intention of the parties." *Downs v. Rosenthal Collins Group, L.L.C.*, 2011 IL App (1st) 090970, ¶ 23. "In order to do so, a court must look to the language of the contract as a whole, taken in context." *Id.*

¶ 36    In this contract, there are two provisions related to the practice of urological medicine by a doctor after he or she terminates membership. Dr. Matschke agreed, in section 9.7 of the Operating Agreement, not to practice urological medicine within a five-mile radius of Uropartners' offices for two years following the termination of his membership. Had he done so, he would have been in breach of the contract. Recognizing the difficulty of setting an amount of damages for such a breach, the parties agreed on injunctive relief instead: a redeeming member who violates that

provision must cure the violation by removing himself or herself from the restricted five-mile area until Uropartners has received the benefit of 24 full months free of competition from that redeeming member in that designated area.

¶ 37　Section 10.6(b)(ii), by contrast, does not commit a departing doctor to any particular limitation on his or her new practice area. Instead, it incentivizes any departing doctor who *also* refrains from practicing medicine within a larger 30-mile radius during the two years following that member's departure. In contrast to section 9.7, section 10.6(b)(ii) did not prohibit Dr. Matschke from engaging in any conduct. The focus of section 10.6(b)(ii) was not on compensating Uropartners for a breach of the agreement but on incentivizing Dr. Matschke to do something above and beyond what he has already agreed to do. It was a carrot, not a stick. Because section 10.6(b)(ii) establishes a condition for an incentive payment to the departing doctor and does not fix an amount of damages intended to redress the breach of an affirmative obligation under the contract, it is simply not a liquidated damages clause.

¶ 38　For this reason, *GK Development, Inc. v. Iowa Malls Financing Corp.*, 2013 IL App (1st) 112802, relied on by Dr. Matschke, is simply not applicable here. The contract there was for the sale of several shopping centers. *Id.* ¶ 1. It required a portion of the sellers' proceeds to be held in escrow and paid to the sellers only when the sellers performed certain obligations under the contract, including the issuance of necessary permits and the securing of a major lease agreement from a prospective tenant. *Id.* ¶¶ 1, 14. Applying the factors noted above, we concluded that the provision was unenforceable. *Id.* ¶ 75. The record was devoid of any evidence that the parties had considered what would be an appropriate amount of damages for a minor permitting delay, as opposed to a complete failure to secure the lease in question, and the $4.3 million holdback, which bore no relation to the buyers' actual damages, was in our view a windfall recovery. *Id.* ¶¶ 50-66.

The large sum of money at issue in *GK* was not an incentive for going above and beyond the meeting of the sellers' affirmative obligations; it was a clear penalty for nonperformance of those obligations. The factors this court considered in *GK* simply have no application here.

¶ 39                    B. Section 10.6(b)(ii) Is Not an Unlawful Restraint on Trade

¶ 40     Dr. Matschke also argues that section 10.6(b)(ii) is an impermissible restraint on trade. As we have repeatedly recognized, a postemployment restrictive covenant will be enforced, so long as its terms are "reasonable." *Woodfield Group, Inc. v. DeLisle*, 295 Ill. App. 3d 935, 938 (1998). Our supreme court has held that a restrictive covenant will be found reasonable if it "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee, (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 17.

¶ 41     Consideration of the first factor requires us to view the breadth of the restriction in light of the interest it is meant to protect. *Johnson v. Country Life Insurance Co.*, 12 Ill. App. 3d 158 (1973), which Dr. Matschke primarily relies on, is a good example of a clear mismatch between these two elements. The contractual provision at issue there required an insurance agent to forfeit all of his renewal commissions—his percentage of the annual premiums paid between the second and tenth year of each policy—if he worked for another company in 1 of 11 states in which his former employer conducted business. *Id.* at 159-60. This court acknowledged that the agent was not directly restrained from practicing within his "trade, profession or business" but highlighted the practical consequences of the provision. *Id.* at 163-64. If the employee were to engage in these restricted activities, he would forfeit renewal commissions that comprised a significant portion of the compensation he was owed for his prior work with the company, and that would have a material impact on his livelihood. *Id.* at 164. We ultimately decided that the restrictive covenant imposed a

far greater restraint on the agent than was necessary to protect his employer's interests. *Id.*

¶ 42    Nothing about the breadth of the restraint in section 10.6(b)(ii) is similarly disabling. Contrary to Dr. Matschke's assertions, that section does not "*prohibit[ ]* the 'practice of medicine' " (emphasis added) in any geographical region. Nor does it "seek[ ] to enjoin activity through a financial penalty." Rather, it establishes a condition and a corresponding incentive that redeeming members are free to avail themselves of or not. The credit available against the redeeming member's debt obligation, though substantial, is not so great that it would leave no real choice regarding compliance. Dr. Matschke stood to lose an amount of money he had invested, but not a substantial portion of his past earnings with Uropartners. Indeed, the evidence on summary judgment was that, when the other doctors at Uropartners heard rumors that Dr. Matschke intended to practice within the company service area, one of them speculated that Dr. Matschke knew he would forfeit reimbursement of the common purchase price and had decided that his new salary and the benefits to his family from the move were worth the loss.

¶ 43    With respect to the second factor, the cost of compliance was not substantial. As Dr. Matschke points out, once he was notified that he was within the 30-mile radius, he was able to switch to another facility with the same employer. The cost of compliance was not so great that he had no choice but to forfeit the incentive payment.

¶ 44    And Dr. Matschke has not shown that this additional restraint or the incentive attached to it is injurious to the public. As Uropartners points out, Dr. Matschke presented no evidence of lost revenue, patient cancellations, or any other harm that his practice in Wisconsin suffered as a result of Uropartners' enforcement of the parties' agreement.

¶ 45    In sum, the circuit court was correct to conclude that the restriction here was not unreasonable.

¶ 46    C. Uropartners Did Not Waive Strict Compliance With Section 10.6(b)(ii)

¶ 47    Dr. Matschke also argues that Uropartners intentionally waived compliance with section 10.6(b)(ii) of the Operating Agreement by failing to put him on notice that he might be in violation of the condition set out in section 10.6(b)(ii) of the Operating Agreement if he worked in Wisconsin. Waiver is the "voluntary and intentional relinquishment of a known and existing right." *Whalen v. K Mart Corp.*, 166 Ill. App. 3d 339, 343 (1988). It can be express or implied, but the implied waiver of a legal right will only be found "when [the] conduct of the person against whom waiver is asserted is inconsistent with any other intention than to waive it." *Id.* Whether a party's actions are sufficient to constitute waiver is a question of law we review *de novo*. *Id.*

¶ 48    Here, the fact that doctors at Uropartners learned that Dr. Matschke was seeking employment that might bring him within the company service area triggered no duty on their part to inform him of the obvious—that he would not earn the common purchase price component set out in his redemption calculations if he did so. The burden was clearly on Dr. Matschke to ascertain the boundaries of the company service area and to decide whether compliance with the additional restriction on his practice was worth the incentive offered by Uropartners or whether the benefits of his new position made forgoing that payment his better option. Nor, once it knew for sure that he had begun practicing within the company service area, was there any reason for the Uropartners doctors to notify Dr. Matschke of his noncompliance, other than to explain why Uropartners' payments to him had ceased. Unlike section 9.7, section 10.6(b)(ii) does not provide that a redeeming member may "cure" a violation.

¶ 49    The circumstances that resulted in a finding of waiver in *Bartels v. Denler*, 30 Ill. App. 3d 499 (1975), the only case Dr. Matschke relies on for this argument, are far different from those present here. The plaintiff in *Bartels* entered into a contract with his employers, the owners of a

grocery store, for a weekly salary plus a year-end incentive bonus of 10% of the store's profits. *Id.* at 500. The contract forbade the plaintiff from accepting other employment without the grocers' consent and provided that they could terminate the agreement if they learned he had done so. *Id.* Despite these provisions, the plaintiff openly worked for a drugstore on his days off from the grocery store. *Id.* at 500-01. The grocers knew this but never said anything to him about it; they instead asked him to spend additional time in their store, which he did. *Id.* at 501. When the plaintiff ultimately left the store to start his own business, the grocers refused to pay him the incentive bonus for his last full year of work. *Id.* We agreed with the trial court that he was entitled to that additional compensation because, rather than bring the plaintiff's violation of the contract to his attention, they had allowed him to continue his employment with them for over a year. *Id.* The employers' conduct in *Bartels* was inconsistent with any other intention but the waiver of their right to terminate the plaintiff's employment. The same simply cannot be said here. Indeed, as the circuit court pointed out, the internal Uropartners e-mails presented at summary judgment demonstrated only that Uropartners fully intended at all times to enforce its agreement with Dr. Matschke.

¶ 50          D. The Provision Applies to a Technical and Inadvertent Violation

¶ 51     Dr. Matschke also contends that his conduct amounted to no more than a "technical," unintentional violation of the Operating Agreement that caused no real injury to Uropartners because it was immediately cured. He argues that Uropartners was required to establish that he materially breached the agreement to trigger forfeiture of the common purchase price portion of his redemption payment. The cases Dr. Matschke cites simply do not support this position.

¶ 52     At issue in *Rogers v. Balsley*, 240 Ill. App. 3d 1005, 1011 (1993), was whether there had been a material breach sufficient to *completely discharge* the other party's duty to perform under

the contract. The defendants in that case were purchasers who failed to send written notice of their inability to obtain financing to the sellers' home address as required by the real estate purchase agreement. *Id.* at 1006-07. The sellers viewed this as a material breach of the agreement, relieving them of their obligation to return the purchasers' earnest money. *Id.* at 1007. We concluded that it was not a material breach, however, where the sellers were aware of the notice and its contents because it had been sent to their lawyer within the specified time period. *Id.* at 1011. Where the purpose of the notice provision had been fulfilled, we concluded that substantial performance had occurred and that equitable principles should prevent a complete forfeiture. *Id.*

¶ 53     Unlike in *Rogers*, a complete forfeiture of the parties' contract is not at issue here. As Uropartners points out, Dr. Matschke was well compensated as a member of the Uropartners entities. All that is disputed is whether he fulfilled a condition that would have earned him additional compensation for his redeemed interest in those entities. The undisputed facts reveal that he did not. Nor do the equities favor Dr. Matschke as they did the purchasers in *Rogers*. Dr. Matschke does not dispute that, as a continuing member of Uropartners, he benefited financially when another member withdrew from the practice, failed to fulfill the same condition, and was denied the same additional compensation.

¶ 54     *Graber v. Badegian*, 242 Ill. App. 3d 1049, 1054 (1993), also cited by Dr. Matschke, contains no discussion of technical versus material breaches. We held there that a preliminary injunction was properly denied where the trial court concluded that the hardship the defendant would bear—likely bankruptcy—if she was forced to move her dental practice outside the boundaries of a restrictive covenant far outweighed any injury to the plaintiff from the location of her practice just within the boundaries specified in the parties' agreement. *Id.* at 1054-55. As we noted in that case, a preliminary injunction is an extraordinary remedy. *Id.* at 1053. The party

seeking one must demonstrate, among other things, that there is no adequate remedy at law, that irreparable injury will result if the injunction is not granted, and that the loss or inconvenience to the opposing party would be comparatively small. *Id.* at 1053-54. *Graber* certainly does not hold that "technical" violations of restrictive covenants may be overlooked as a matter of course.

¶ 55    Dr. Matschke argues he caused no injury to Uropartners by practicing for a relatively brief period of time within the company service area and that he "cured" any possible harm to Uropartners by moving his practice outside of that area. As noted above, however, section 9.7 of the Operating Agreement includes a specific provision allowing a departing doctor to cure a violation of the restrictive covenant outlined in that section by moving outside of the defined area for a period of time equal to that specified. Section 10.6(b)(ii), in contrast, establishes no "cure" for a failure to fulfill the condition that would entitle a noncomplying redeeming member to the common purchase price component of his or her redemption payment. As we have explained in detail above, we view section 10.6(b)(ii) of the Operating Agreement not as the remedy for a breach of the contract, "technical" or otherwise, but as a condition set on additional payment that is intended to incentivize behavior above and beyond what a redeeming member has already committed to do. As the contract makes clear, a failure to fulfill that condition simply cannot be "cured" by moving outside the area, and a doctor who practices within that area for any part of the applicable two-year period is not entitled to the credit for the common purchase price of his ownership interest.

¶ 56                                    IV. CONCLUSION

¶ 57    We conclude that section 10.6(b)(ii) of the parties' Operating Agreement is neither an unenforceable liquidated damages clause nor an unreasonable restraint on trade but rather a condition placed on an incentive payment. Uropartners did not affirmatively waive strict

compliance with that provision, and the provision should be enforced as written. For all of the above reasons, we affirm the judgment of the circuit court granting summary judgment in favor of Uropartners.

¶ 58    Affirmed.

*Matschke v. UroPartners, LLC*, **2023 IL App (1st) 221112**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2019-CH-13709; the Hon. Caroline K. Moreland, Judge, presiding. |
| **Attorneys for Appellant:** | Kristen E. Prinz, Amit Bindra, and Laura Lefkow-Hynes, of Prinz Law Firm, P.C., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jonathan S. Goodman and Elizabeth L. Archerd, of Patzik, Frank & Samotny Ltd., of Chicago, for appellees. |